**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Louis NASH and Ken Nash,
Defendants–Appellants.**

Nos. 92–3985 & 93–2231.

United States Court of Appeals,
Seventh Circuit.

Argued March 30, 1994.

Decided July 21, 1994.

K. Tate Chambers, Asst. U.S. Atty. (argued), Peoria, IL, for plaintiff-appellee.

Robert Gaubas (argued), Peoria, IL, for Louis Nash.

Richard H. Parsons (argued), Peoria, IL, for Ken Nash.

Before POSNER, Chief Judge, MANION, Circuit Judge, and REYNOLDS, District Judge.[*]

MANION, Circuit Judge.

Louis Nash, and his son, Ken Nash, were involved in the marijuana business. Both pleaded guilty to conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). Louis was sentenced to 262 months imprisonment followed by three years supervised release. Ken was sentenced to 68 months imprisonment followed by four years supervised release. Both appeal and we affirm.

## I. Background

During a good part of the 1980's, Louis and Ken Nash were involved in a multi-state marijuana distribution business based out of Treasure Island, Florida. The transactions underlying defendants' guilty pleas in this case began prior to 1986, when Louis met Randy Cremer, a marijuana dealer from Illinois. At that meeting Louis asked Cremer if he would distribute marijuana for him. Cremer agreed and later contacted Louis in Florida to arrange the purchase of marijuana. As a result of this contact, Cremer, and other persons in his circle, travelled to Florida on many occasions in order to buy carloads of marijuana for distribution to customers in eastern Iowa and western Illinois. During this period, both Louis and Cremer recruited drivers, including Rick Baker, to transport marijuana from the Nashes in Florida to Illinois and Iowa. Baker in turn recruited Roger Littlejohn. When Littlejohn was arrested transporting his second load of marijuana from the Nashes, Louis bonded him out of jail and paid for his attorney.

In January of 1987, the Nashes shifted part of their operation to Michigan. Among other locations, they worked outside of Ann Arbor from a dog kennel owned by Ken Nash. Sid Getter, also involved with the Nashes' operation, arranged for the delivery of approximately 5,000 pounds of marijuana to the kennel. Ken Nash and others began to distribute the marijuana from this location. Cremer and Baker, who continued to be customers of the Nashes, now travelled to Michigan to obtain their marijuana.

In the summer of 1987, a federal drug task force, code-named Operation Iron Eagle, began investigating Ken Nash and Cremer. Shortly thereafter, on November 11, 1987, Ken was arrested following a traffic stop. Officers discovered five pounds of marijuana, a handgun, and a stun gun in his car. Following a bench trial, Ken was convicted of possession of marijuana with intent to distribute and carrying a firearm during a drug trafficking offense. He was sentenced to six months on the possession charge and five years for the weapons violation. His conviction was affirmed in *United States v. Nash*, 876 F.2d 1359 (7th Cir.1989), *cert. denied*, 493 U.S. 1084, 110 S.Ct. 1145, 107 L.Ed.2d 1049 (1990).

After Ken was arrested, his wife dumped the marijuana from their house into a nearby river. Cremer retrieved approximately 25 to 30 pounds of it, took it back to Galesburg, Illinois, and sold it. Louis and Sid Getter burned the rest of the marijuana supply stored at the kennel in Michigan, as much as 1,000 pounds.

On August 23, 1990, a federal grand jury sitting in the Central District of Illinois charged Ken Nash, Cremer, Baker, and several others with conspiracy to distribute marijuana. By December 19, 1990, all of the defendants except Ken and another defendant, Kevin Akers, had pleaded guilty. On December 19, 1990, the government filed a superseding indictment, again charging the two remaining defendants, Ken Nash and Kevin Akers, with conspiracy to distribute marijuana, and adding Louis Nash, charging him with conducting a continuing criminal enterprise and conspiring to distribute marijuana. Akers pleaded guilty on July 18, 1991. Ken pleaded guilty on September 11, 1992. Finally, Louis pleaded guilty on September 18, 1992 to the charge of conspiracy to distribute marijuana.

* Hon. John W. Reynolds, District Judge for the Eastern District of Wisconsin, is sitting by designation.

On November 10, 1992, Louis changed his mind and filed a motion to withdraw his plea of guilty. This motion was denied. Louis was sentenced to 262 months imprisonment followed by three years supervised release. Ken was sentenced to 68 months imprisonment (126 months less 58 months time served on his related criminal conviction) followed by four years supervised release.

Defendants present several issues on appeal: (1) whether the trial court abused its discretion in denying Louis' motion to withdraw his guilty plea, (2) whether the district court was clearly erroneous in calculating the total drug weight under the Sentencing Guidelines, and (3) whether the government violated defendants' due process rights under *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

## II. Analysis

■ Louis Nash first appeals the district court's denial of his motion to withdraw his plea of guilty. Federal Rule of Criminal Procedure 32(d) authorizes a court to permit the withdrawal of a guilty plea in certain circumstances. The rule provides in pertinent part:

> If a motion for withdrawal of a plea of guilty ... is made before sentence is imposed ... the court may permit withdrawal of the plea upon a showing by the defendant of any fair and just reason.

Fed.R.Crim.P. 32(d). "A defendant does not have an absolute right to withdraw his guilty plea, and the decision to allow him to do so is within the sound discretion of the trial court." *United States v. McFarland*, 839 F.2d 1239, 1241 (7th Cir.), *cert. denied*, 486 U.S. 1014, 108 S.Ct. 1750, 100 L.Ed.2d 212 (1988). The defendant bears the burden of proving that a "fair and just" reason exists. *United States v. Coonce*, 961 F.2d 1268, 1275 (7th Cir.1992). The district court's factual findings concerning whether the defendant has demonstrated such a fair and just reason will be given great weight and will not be reversed except for clear error. *McFarland*, 839 F.2d at 1241; *United States v. Alvarez–Quiroga*, 901 F.2d 1433, 1436 (7th Cir.), *cert.*

*denied*, 498 U.S. 875, 111 S.Ct. 203, 112 L.Ed.2d 164 (1990).

In this case, Louis Nash offered three different "fair and just" reasons that, he alleges, were sufficient to permit the withdrawal of his plea. He contends (1) that his plea was not voluntarily made, (2) that it was error to allow a different judge (than the judge who actually took the plea) to hear his motion to withdraw, and (3) that the government breached the plea agreement in this case by failing to take full advantage of his decision to cooperate. He contends that the district court abused its discretion in concluding that these reasons were not "fair and just" under the Rule. We disagree.

■ First, the district court did not abuse its discretion in concluding that Louis' plea was voluntary. One "fair and just reason" for a plea withdrawal is that the plea was involuntary. *Alvarez–Quiroga*, 901 F.2d at 1436 (citing *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)). In order to demonstrate that his plea was involuntary in this case, Louis argued to the district court that he was under tremendous pressure at the time of his plea hearing and that this pressure caused him great confusion, rendering him unable to understand the plea process and the exact nature of his plea. This confusion and misunderstanding is alleged to have stemmed from the cumulative effect of several circumstances: his defense attorney was about to be sworn in as an Illinois circuit judge, he was unable to obtain documents for his defense that were destroyed by Hurricane Andrew, and he had not received adequate cooperation from the United States Marshals Service in serving defense witness subpoenas.

It is well settled in this circuit that " '[t]he only rational manner in which a judge may determine whether a plea is knowingly and voluntarily made, is to observe the defendant's demeanor and responses to the court's questions and to rely on the defendant's sworn answers.' " *United States v. Seavoy*, 995 F.2d 1414, 1421 (7th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993) (quoting *United States v. Ellison*, 835 F.2d 687, 693 (7th Cir.1987)).

" '[V]oluntary responses made by a defendant under oath before an examining judge [are] binding.' " *Id.* (quoting *Ellison,* 835 F.2d at 693). When a defendant challenges the voluntariness of such a proceeding, he " 'faces a heavy burden of persuasion.' " *United States v. Caban,* 962 F.2d 646, 649 (7th Cir. 1992) (quoting *Ellison,* 835 F.2d at 693).

█ In this case, the record clearly demonstrates that Louis knew and understood each of the elements of his plea. The district judge engaged Louis in a colloquy pursuant to Fed.R.Crim.P. 11(c) and fully and carefully questioned him on each aspect of his plea. Louis, for his part, continually answered in the affirmative, stating, for example, "I understand" or "I understand everything." Louis also signed a written plea agreement which states in pertinent part:

> I have read this entire Plea Agreement carefully and have discussed it fully with my attorney. I fully understand this Agreement, and I agree to it voluntarily and of my own free will ... I understand that by signing below I am stating I agree with everything stated in this paragraph, and I am accepting and entering into this Plea Agreement.

When asked whether he had read and reviewed the plea agreement with his attorney before signing it, and whether the plea accurately and completely set forth the agreement between himself and the government, Louis again replied in the affirmative. On several occasions, Louis appeared to hesitate when answering a question. His lawyer, however, explained that Louis was concerned that the judge knew that he was pleading only to marijuana charges, that he was reserving the right to contest the amount of drugs at sentencing, and that he did not agree with certain dates alleged in the indictment. From our examination of the record there is nothing to indicate that Louis was in any way confused or incapable of rational, voluntary responses at the time of his plea. Nor is there any indication that the circumstances that allegedly caused his anxiety rose to such a level as to render his plea involuntary. Louis has failed to meet his burden in this case and is therefore bound by his responses. The district court did not abuse its discretion in refusing to allow Louis to withdraw his plea on this basis.[1]

█ Louis next alleges that it was error for a different district judge to preside over the hearing on his motion to withdraw. In this case, Judge McDade took the plea—filling in for Judge Mihm while he was out of town. Judge Mihm then heard Louis' motion to withdraw that plea upon his return. Louis alleges that, because Judge Mihm did not take his plea and personally go through the necessary colloquy, he did not see that Louis was distraught and confused when entering his plea. He alleges that Judge Mihm was therefore unqualified to judge whether his plea was voluntary. The record in this case, however, reveals that Judge Mihm carefully read the transcript of the change of plea hearing and concluded that:

> Judge McDade was exhaustive in insuring that Mr. Nash fully understood the terms of the agreement and was conversant with them....
>
> I'm satisfied, based on everything I know of this case and everything that Mr. Nash the plea is the best method for establishing the factual basis for the plea. *Id.* at 356.

The requirements outlined above were followed in this case. During the Rule 11 hearing, the prosecutor specifically recited facts that the government was prepared to prove at trial, including the testimony of co-defendant Cremer and other persons involved in the many drug transactions that took place as early as 1984 and 1985. When questioned by the judge about whether the government's allegations were true, Louis responded that he was "not guilty of any particular thing in '84, '85 ...," but agreed that the substance of the government's case was "substantially" correct. We find no error here.

---

1. As an additional matter, Louis alleges (in a very cursory fashion) that the district court failed to adequately determine the factual basis for his plea. Federal Rule of Criminal Procedure 11(f) specifically states that "[n]otwithstanding the acceptance of a plea of guilty, the court should not enter a judgment upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea." "The responsibility of the prosecutor to provide a factual basis lies in putting his specific case against a particular defendant in the record during the Rule 11 hearing." *United States v. Fountain,* 777 F.2d 351, 355 (7th Cir.1985), *cert. denied,* 475 U.S. 1029, 106 S.Ct. 1232, 89 L.Ed.2d 341 (1986). A dialogue between the court and the person making

has told us about his relationship with Mr. Vespa [Louis' defense attorney], that he was fully aware of all of the nuances of the plea agreement and everything that it stood for, so any suggestion now that he did not somehow understand the circumstances of the plea, I reject that out of hand.

The second point, these three items about Mr. Vespa leaving to become a judge, a problem with the documents in Florida, some problem with subpoenas, all of those things were known prior to the time that he tendered the plea of guilty and I don't think that would support a withdrawal of the plea at all.

... there is no question in my mind that he did knowingly plead guilty to conspiracy and that, in fact, he is guilty of conspiracy.

Louis has not demonstrated how Judge Mihm's assessment is clearly erroneous and we find no indication in the record that Judge Mihm was not otherwise qualified to hear Louis' motion to withdraw and judge it fairly. The district court did not abuse its discretion in refusing this proffered reason as well.

■ Finally, Louis alleges that the government breached his plea agreement by failing to zealously interview him and take full advantage of his decision to cooperate (and therefore allow him to see the results of such cooperation reflected in his sentence). As Louis points out, the government is required to honor its promises to consider specific mitigating circumstances, such as the cooperation of the defendant, when making sentencing recommendations pursuant to plea agreements. *United States v. O'Brien*, 853 F.2d 522, 525 (7th Cir.1988). "If the government has breached an agreement to make specific recommendations or to consider specific mitigating circumstances, federal courts have both the power and the duty to order appropriate relief." *Id.* "[S]uch relief may include allowing the defendant to withdraw his or her guilty plea." *Id.* However, based on the record before us, we do not agree that the government has broken its promise.

The provision in Louis' plea agreement at issue in this case reads as follows:

9. The government reserves the right, in its sole discretion, to make a motion at the time of sentencing for a downward departure from the sentencing guideline range pursuant to § 5K1.1 of the Sentencing Guidelines and the statutory mandatory minimum pursuant to 18 U.S.C. § 3553(e) if the defendant provides substantial assistance in the investigation or prosecution of other criminal offenses. The extent of any such recommended departure will depend upon the government's evaluation of the nature, extent, and value of the defendant's assistance including his truthfulness.

The government did interview Louis as agreed. The information that he provided, however, proved nearly worthless. The government therefore did not interview Louis further.

The government in this case simply found the information Louis provided to be of little value. Judge Mihm agreed, stating:

It's clear to me that in terms of the information that they received directly from Lou Nash, that most of that information was information that was perhaps interesting background information, perhaps would have some value as intelligence information, but in terms of information where he can directly place someone in the commission of a crime within the statute of limitations, I don't believe that he did that. I don't necessarily disagree with Mr. Vespa that if he did give information regarding someone from 1986, that might be something to look into. But unless something was developed within the statute of limitations, it ends up being information that's not very valuable.

From our evaluation of the record, this assessment is not clearly erroneous. The government, therefore, was clearly within its right in not recommending a downward departure under the Sentencing Guidelines. Where there was no breach, there is no basis in this case for allowing Louis to withdraw his plea. There was, therefore, no abuse of discretion on the part of the district court in rejecting this final reason to withdraw his plea.

■ Both defendants next challenge the amount of drugs used to calculate their of-

fense levels. Defendants specifically complain that the testimony of their co-defendants at sentencing (as to those amounts) was not credible. They allege that these witnesses may have had memory lapses or were merely seeking some benefit for themselves through testifying. Arguments centered on credibility of witnesses and weight given to testimony at trial generally do not get very far on appeal. And in any event, the record here reveals that much of the court's calculation was based on the testimony of Louis and Ken Nash. Defendants for their part, however, completely fail to identify any specific instances in the record to support their allegations. Beyond their general argument, they present no argument and cite no authority relating to the credibility or reliability of these witnesses. This circuit has on several occasions warned litigants that "'perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).'" *United States v. Windom,* 19 F.3d 1190, 1198 (7th Cir.1994) (quoting *United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir.1991)). Without specific arguments or allegations of error with authority to back them up, defendants' shallow claims of witness incredibility are unreviewable. For these reasons defendants' allegations of error on this issue are waived.

Lastly, defendants argue that the government violated their due process rights under *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Ken argues that the government violated his due process rights under *Kastigar* in this case,[2] by improperly using an immunized proffer entered into between himself and the United States Attorney's Office during the proceedings that eventually ended in his prior related conviction. Specifically, Ken contends that the government used this proffer to anger his co-defendants and convince them to testify

against him in this action. Both defendants allege that the government violated their due process rights under *Brady,* by withholding from them the alleged fact that co-defendant Cremer cooperated with the government in order to take revenge for Ken's earlier cooperation with the government. Both arguments are meritless.

■■ First, to the extent that Ken alleges, under *Kastigar,* that his immunized statements were improperly used by the government to influence his co-defendants to testify against him at trial, this argument is waived. It is well settled in this circuit that a plea of guilty waives any defense that might have been offered at trial. *United States v. Nunez,* 958 F.2d 196, 200 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 168, 121 L.Ed.2d 115 (1992). A defendant's plea of guilty admits, in legal effect, the facts charged and waives all non-jurisdictional defenses including those constitutional violations not logically inconsistent with the valid establishment of factual guilt. *See id.; United States v. Brown,* 870 F.2d 1354, 1360 (7th Cir.1989); *Eaton v. United States,* 458 F.2d 704, 707 (7th Cir.), *cert. denied,* 409 U.S. 880, 93 S.Ct. 208, 34 L.Ed.2d 135 (1972).

In this case, Ken raised *Kastigar* as a defense to his indictment, arguing that the government had used his proffered statement from the earlier case to obtain an indictment from the grand jury in the present case. The district court, however, denied Ken's motion, finding that the government met its burden of proving an independent source for the evidence that it presented to the grand jury. Ken, in a motion to reconsider, then alleged a new basis for his *Kastigar* motion: that the government had tainted his co-defendants (now government witnesses) by providing copies of his proffer to them during discovery. The district court scheduled a hearing on this question for the day before Ken's trial was scheduled to begin. The hearing, however, never occurred. Ken pleaded guilty approximately two weeks be-

---

**2.** The United States Supreme Court in *Kastigar* held that, in a subsequent prosecution of a person who has been granted immunity to testify, the prosecution has the burden of proving affirmatively that evidence proposed to be used is derived from a legitimate source wholly independent of compelled testimony. *Kastigar v. United States,* 406 U.S. 441, 460–61, 92 S.Ct. 1653, 1665, 32 L.Ed.2d 212 (1972).

fore his trial date without preserving this issue. *See Brown,* 870 F.2d at 1360 (defendant pleaded guilty unconditionally, thereby relinquishing any claim he may have had with respect to a denial of a motion to suppress).

 In addition, to the extent that Ken argues that his immunized proffer statements may have influenced his co-defendants, particularly Cremer, to testify against him at sentencing, he has waived this argument as well. Ken cites no portion of the record where a timely objection was made to Cremer's testimony. In addition, while the government concedes that Ken raised a *Kastigar* argument in a post-sentencing motion to reconsider sentence and judgment (challenging an enhancement for obstruction of justice and arguing that it was improper for the district court to rely on Cremer's testimony) this motion was denied and Ken does not challenge this denial on appeal. Other than this, Ken does not appear to have availed himself of any opportunity to argue this issue below. His failure to do so waives this issue for appeal. *See United States v. Bolton,* 977 F.2d 1196, 1199 (7th Cir.1992) (finding that defendant waived *Kastigar* argument by failing to argue this issue in the district court).

 Finally, both defendants argue that their due process rights under *Brady v. Maryland* were violated.[3] To make a successful claim under *Brady,* defendants "must establish (1) that the prosecutor suppressed evidence; (2) that such evidence was favorable to the defense; and (3) that the suppressed evidence was material." *United States v. Hartmann,* 958 F.2d 774, 790 (7th Cir.1992); *accord United States v. Guerrero,* 894 F.2d 261, 268 (7th Cir.1990). In this case, defendants contend that the government knew that Cremer cooperated with the government and testified against them at sentencing in order to take revenge for Ken Nash's earlier cooperation with the government. Defendants then assert that the government knowingly withheld this information. Defendants fail, however, to cite a single portion of the record in support of this assertion. They simply allege that this must have been the case since Cremer knew about Ken's prior cooperation with the government. This is pure speculation and, as we have stated before, speculation is not sufficient to establish that the government has suppressed evidence under *Brady.* *United States v. Nolan,* 910 F.2d 1553, 1558 (7th Cir.1990), *cert. denied,* 499 U.S. 942, 111 S.Ct. 1402, 113 L.Ed.2d 457 (1991).

In addition, even if defendants were able to prove that Cremer was motivated by revenge and that the government knowingly suppressed this fact, defendants have failed to demonstrate how this evidence was material to their case. Evidence is "material" only if there is a " 'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " *Guerrero,* 894 F.2d at 268 (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)). Defendants completely fail to address this issue in their brief. Perhaps evidence of Cremer's alleged revenge motive could have been used to impeach his testimony,[4] but such impeachment cannot be characterized as anything but minor under these facts. We conclude, therefore, that defendants fail this portion of *Brady* as well.[5]

3. In *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." This circuit has recognized that *Brady* may be invoked to challenge a prosecutor's failure to reveal evidence that may be favorable to an accused at sentencing. *See, e.g., United States v. Guerrero,* 894 F.2d 261, 268 (7th Cir.1990).

4. The Supreme Court in *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985), has stated that the rule announced in *Brady* applies equally to impeachment as well as exculpatory evidence.

5. It is unclear from the briefs whether defendants also allege that the government violated *Brady* in failing to disclose Cremer's alleged revenge motive prior to their pleading guilty. To the extent that they make this additional argument, it is waived for appeal. *See Nunez,* 958 F.2d at 200 (a plea of guilty waives any defense

### III. Conclusion

Defendants have not demonstrated that the district court abused its discretion in refusing to allow Louis Nash to withdraw his guilty plea and have completely failed to present cogent arguments on their allegation of error in calculating the amount of drugs for purposes of sentencing, waiving this argument for appeal. We also find that Ken Nash has waived any arguments that he may have had under *Kastigar v. United States* and find that both defendants' *Brady* allegations lack merit. For the foregoing reasons, the judgment of the district court is AFFIRMED.

that might have been offered at trial). We note, on the other hand, that at least two other Circuits have stated that, where a defendant later challenges a guilty plea, *Brady* may be invoked to challenge the voluntariness of the plea where a defendant's (otherwise voluntary) plea was given without knowledge of the undisclosed exculpatory evidence. *See White v. United States,* 858 F.2d 416, 421–22 (8th Cir.1988), *cert. denied,* 489 U.S. 1029, 109 S.Ct. 1163, 103 L.Ed.2d 221 (1989); *Campbell v. Marshall,* 769 F.2d 314, 318–24 (6th Cir.1985), *cert. denied,* 475 U.S. 1048, 106 S.Ct. 1268, 89 L.Ed.2d 576 (1986). Defendants, however, did not raise or argue this point in the district court or on appeal. We therefore refrain from addressing it ourselves.